# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KEVIN JUNKER, Derivatively on Behalf of Nominal Defendant ALLBIRDS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| JOSEPH ZWILLINGER, TIMOTHY BROWN, DAN LEVITAN, DICK BOYCE, NEIL BLUMENTHAL, MANDY FIELDS, ANN FREEMAN, EMILY WEISS, NANCY GREEN, and MICHAEL BUFANO, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ALLBIRDS, INC., | ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Kevin Junker ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Allbirds, Inc. (herein referred to as "Allbirds" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal

knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, including the allegations of the amended class action complaint filed in the securities class action captioned *In Jinghua v. Allbirds, Inc.,* Case No.: 3:23-cv-01811-AMO (N.D. Cal.) (the "Securities Class Action"), conference call transcripts and announcements, filings with the United States Securities and Exchange Commission (the "SEC"), press releases published by and regarding Allbirds, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Allbirds against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least November 4, 2021, and March 9, 2023, inclusive (the "Relevant Period") and violation of the federal securities laws by causing the issuance of materially false and misleading statements in the Company's SEC filings and in other public statements that have exposed the Company to massive class-wide liability, as well as the expenditure substantial defense costs in connection with the Securities Class Action, as set forth below.

2.     Allbirds was founded in 2015 by Co-Chief Executive Officer ("CEO")

Defendant Joseph Zwillinger and former Co-Chief Executive Officer Timothy Brown as a footwear company that prioritized sustainability. Allbirds' core products are its comfortable shoes produced with natural materials including the Wool Runner, the Tree Runner, and Dasher. With the launch of these core products, Allbirds experienced tremendous growth.

3.     On August 31, 2021, in connection with an initial public offering (the "IPO"), the Company filed a Registration Statement with the SEC which, after several amendments, was declared effective on November 2, 2021. On November 4, 2021, Allbirds filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, Allbirds issued approximately 16,850,799 shares of Class A common stock at a price of $15.00 per share, generating proceeds of roughly $237 million.

4.     Leading up to the IPO and in the years that followed, the Company shifted its business strategy in three significant ways that were undisclosed to the public. First, Allbirds shifted its focus away from its core consumer and began overinvesting in products to appeal to an entirely different demographic. The Company's new offerings ultimately did not resonate with customers. Second, Allbirds expanded its physical retail stores at an overly aggressive pace despite the fact that existing stores were struggling to attain profitability. The Company opened stores with little regard for the economics of the stores or even for their proximity to

existing stores, causing market saturation and cannibalization, whereby Allbirds stores were forced to compete with one another. Lastly, despite publicly acknowledging numerous times that brand awareness was central to Allbirds' success, the Individual Defendants[1] cut the Company's brand marketing budget by half each year beginning in 2019, instead focusing on short-term marketing strategies.

5.      Throughout the Relevant Period, the Individual Defendants issued false and misleading statements, indicating that they were "continuously seeking ways to engage" with the Company's core customers, touting the Company's retail stores and representing that they had strong economics, and claiming that they were continuing to prioritize brand marketing and building brand awareness.

6.      The truth was revealed on March 9, 2023, when the Company issued a press release announcing its fourth quarter and full year 2022 financial results which revealed, *inter alia*, a full year 2022 net loss of $101.4 million, a fourth quarter net loss of $24.9 million, a 13% decrease in net revenue as compared to the fourth quarter of 2021, a full year 2022 adjusted EBITDA loss of $60.4 million, and a fourth quarter 2022 adjusted EBITDA loss of $12.5 million that included "a $3.5 million

---

[1] The Individual Defendants in this Action are current or former members of the Company's Board of Directors, along with the Company's former Chief Financial Officer ("CFO"). The Individual Defendants are Joseph Zwillinger, Timothy Brown, Dan Levitan, Dick Boyce, Neil Blumenthal, Mandy Fields, Ann Freeman, Emily Weiss, Nancy Green, and Michael Bufano.

loss primarily associated with the previously announced discontinuation of certain first-generation apparel."

7.    During an earnings call that same day, Co-CEO Defendant Joseph Zwillinger acknowledged that the Individual Defendants' "strategic and executional missteps" had "impacted results." Also on March 9, 2023, Allbirds announced that CFO Defendant Michael Bufano was stepping down.

8.    On this news, the Company's stock price declined a staggering 47% in just one day, closing at $1.25 per share on March 10, 2023.

9.    On May 4, 2023, the Company announced that Co-CEO Defendant Timothy Brown would step down as Co-CEO and transition into the position of Chief Innovation Officer, a non-executive role.

10.    By the commencement of this action, the Company's stock price had closed as low as $1.02  a 92.9% decline from the Company's $15.00 per share IPO price.

11.    As a result of the foregoing, the Securities Class Action was filed, exposing the Company to massive class-wide liability.

## JURISDICTION AND VENUE

12.    This has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Securities Exchange Act") (15 U.S.C. §§

78j(b) and 78t(a)), Section 11(f) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77k(f)(1)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

13.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

16.     Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), as Allbirds is incorporated in this District and a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District.

## **PARTIES**

### *Plaintiff*

17.     Plaintiff is, and has been at all relevant times, a shareholder of Allbirds.

*Nominal Defendant*

18.    Nominal Defendant Allbirds is incorporated under the laws of the State of Delaware.

19.    The Company's principal executive offices are located at 730 Montgomery Street, San Francisco, California 94111.  Allbirds' common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "BIRD."

*Individual Defendants*

20.    Defendant Joseph Zwillinger ("Zwillinger") is one of Allbirds' co-founders. Defendant Zwillinger has served as the Company's Co-CEO, and then CEO, since October 2015 and has served as Allbirds' President and as a member of the Board since May 2015. According to the Company's public filings, Defendant Zwillinger received $4,449,210 in 2022 in compensation from the Company. As of March 31, 2023, Defendant Zwillinger beneficially owned 12,810,945 shares of Class B common stock, worth $15,373,134[2] and constituting 19.9% of the total voting power in the Company. During the Relevant Period, Defendant Zwillinger sold 166,665 shares of Company stock while in possession of material non-public information for proceeds of $461,786.

---

[2] Valuations of the Individual Defendants' holdings of Company stock are based on the $1.20 per share closing price of Allbirds' stock on March 31, 2023.

21.     Defendant Timothy Brown ("Brown") is one of Allbirds' co-founders. Defendant Brown served as Co-CEO, alongside Defendant Zwillinger from October 2015 until May 4, 2023, when he transitioned into the position of Chief Innovation Officer. Defendant Brown has served as a member of the Board since May 2015. According to the Company's public filings, Defendant Brown received $4,449,192 in 2022 in compensation from the Company. As of March 31, 2023, Defendant Brown beneficially owned 50,000 shares of Class A common stock and 13,955,925 shares of Class B common stock, worth $16,807,110 and constituting 22.1% of the total voting power in the Company.

22.     Defendant Dan Levitan ("Levitan") has served as a member of the Board since July 2016 and serves as Chair of the Compensation and Leadership Management Committee and as a member of the Audit Committee. According to the Company's public filings, Defendant Levitan received $209,996 in 2022 in compensation from the Company. As of March 31, 2023 Defendant Levitan beneficially owned 75,796 shares of Class A common stock and 16,824,330 shares of Class B common stock, worth $20,280,151 and constituting 26.9% of the total voting power in the Company. During the Relevant Period, Defendant Levitan sold 2 million shares of Company stock while in possession of material non-public information for proceeds of $30 million. Defendant Levitan received additional proceeds from a sale of 2 million shares during the Relevant Period by an entity over

which Defendant Levitan exercises control.

23.     Defendant Dick Boyce ("Boyce") has served as a member of the Board since December 2016 and serves as Chair of the Sustainability, Nomination, and Governance Committee and as a member of the Audit Committee. According to the Company's public filings, Defendant Boyce received $219,996 in 2022 in compensation from the Company. As of March 31, 2023, Defendant Boyce beneficially owned 1,850,050 shares of Class B common stock, worth $2,220,060 and constituting 3.0% of the total voting power in the Company.

24.     Defendant Neil Blumenthal ("Blumenthal") has served as a member of the Board since August 2018 and serves as a member of the Compensation and Leadership Management Committee. According to the Company's public filings, Defendant Blumenthal received $192,496 in 2022 in compensation from the Company.

25.     Defendant Mandy Fields ("Fields") has served as a member of the Board since October 2020 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant Fields received $204,996 in 2022 in compensation from the Company.

26.     Defendant Ann Freeman ("Freeman") has served as a member of the Board of the Company since August 2022 and serves as a member of the Sustainability, Nomination, and Governance Committee and the Compensation and

Leadership Management Committee. According to the Company's public filings, Defendant Freeman received $267,942 in 2022 in compensation from the Company.

27.    Defendant Emily Weiss ("Weiss") served as a member of the Board from October 2020 until June 9, 2023. According to the Company's public filings, Defendant Weiss received $189,996 in 2022 in compensation from the Company.

28.    Defendant Nancy Green ("Green") served as a member of the Board from February 2020 until August 12, 2022. According to the Company's public filings, Defendant Green received $176,204 in 2022 in compensation from the Company.

29.    Defendant Michael Bufano ("Bufano") served as Allbirds' CFO from April 2021 until April 24, 2023. According to the Company's public filings, Defendant Bufano received $2,393,041 in 2021 and $1,705,271 in 2022 in compensation from the Company. During the Relevant Period, Defendant Bufano sold 32,739 shares of Company stock while in possession of material non-public information for proceeds of $103,408.

30.    Defendants Zwillinger, Blumenthal, and Bufano are herein referred to as the "Insider Trading Defendants"

***Non-Party Confidential Witnesses***

31.    This action is based on Plaintiff's review, by counsel, of an extensive record of public documents as well as the Amended Class Action Complaint (the

"Amended Complaint") in the Securities Class Action ("Securities Class Action Complaint") which contains detailed allegations based on interviews with nine former Allbirds employees (referred to herein as FEs 1-9) who provided information to plaintiffs' counsel in the Securities Action supporting the allegations in that case. These former employees provided information on a confidential basis and were described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

32.    FE 1 worked as a Senior Analyst, Global Supply Planning for Allbirds from May 2020 to May 2021 and had direct contact with Defendants Zwillinger, Brown, and Bufano.

33.    FE 2 worked as a Flagship Store Leader for Allbirds from August 2019 to July 2022 and as a Manager, Retail Insights from July 2022 until May 2023. FE 2 had direct contact with Defendants Zwillinger, Brown, and Bufano.

34.    FE 3 worked as the Director of Retail for North American for Allbirds from May 2021 until December 2022, handling everything related to the Company's retail stores, including financial results, personnel, training, and operations. FE 3 had direct contact with Defendants Zwillinger, Brown, and Bufano.

35.    FE 4 worked as a high-level member of the brand marketing team from Fall 2020 until Fall 2020. FE 4 had direct contact with Defendants Zwillinger, Brown, and Bufano.

36.    FE 5 worked as a high-level executive in marketing at Allbirds from Summer 2017 until Summer 2022. FE 5 had direct contact with Defendants Zwillinger, Brown, and Bufano.

37.    FE 6 worked as a store manager for Allbirds from January 2020 until September 2022. FE 6's responsibilities included hiring, training, and communicating product needs and product feedback. FE 6 had direct contact with Defendants Zwillinger, Brown, and Bufano.

38.    FE 7 worked as Global Head of Creative for Allbirds from February 2020 until January 2023, overseeing brand marketing and the creating direction of the Company. FE 7 was one of Defendant Brown's direct reports and also had regular contact with Defendants Zwillinger and Bufano.

39.    FE 8 worked as an inventory specialist from January 2019 until July 2019 for Allbirds and as a Senior Accountant Inventory from July 2019 until January 2022. FE 8 recorded inventory and worked closely with supply chain employees.

40.    FE 9 worked as a store leader for Allbirds from January 2019 until March 2022. FE 9's responsibilities included personnel, payroll, and assisting in the opening of new retail stores.

## **FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS**

41.    By reason of their positions as officers and/or directors of Allbirds, and because of their ability to control the business and corporate affairs of Allbirds, the

Individual Defendants owed Allbirds and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Allbirds in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Allbirds and its shareholders.

42.   Each director and officer of the Company owes to Allbirds and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

43.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Allbirds, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.   To discharge their duties, the officers and directors of Allbirds were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45.   Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual

Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Allbirds, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

46.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

47.     To discharge their duties, the officers and directors of Allbirds were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties,

the officers and directors of Allbirds were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Allbirds' own Code of Conduct;

(b)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Remain informed as to how Allbirds conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Allbirds and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Allbirds' operations would comply with all applicable laws and Allbirds' financial statements and

regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

48.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Allbirds.

49.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Allbirds and were at all times acting within the course and scope of such agency.

50.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

**ALLBIRDS' CODE OF CONDUCT**

51.     Allbirds' Corporate Code of Business Conduct and Ethics (the "Code

of Conduct") serves as a guide in "apply[ing] good judgment and the highest personal ethical standards in making business decisions."

52.    The Code of Conduct applies to "every employee, officer and director of the Company," and violations of the Code of Conduct can lead to disciplinary action including "termination of employment and, in appropriate cases, civil legal action or referral for criminal prosecution."

53.    In a section titled "**HONEST AND ETHICAL CONDUCT**," the Code of Conduct states:

> It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The Company's integrity and reputation depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity and sound judgment is the foundation of corporate integrity.

54.    In a section titled "**INSIDER TRADING**," the Code of Conduct states, in relevant part:

> Employees, officers and directors who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes. All non-public information about the Company or about other companies is considered confidential information. To use material, non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is illegal.

55.    In a section titled "**FINANCIAL INTEGRITY**," the Code of Conduct states, in relevant part:

> The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our

books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others. We also rely upon our accounting and other business and corporate records in preparing publicly filed reports. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate and transparent.

## **ALLBIRDS' AUDIT COMMITTEE CHARTER**

56.     Allbirds' Audit Committee Charter states that the purpose of the Audit Committee is to, *inter alia*, "oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements[,] . . . review any reports or disclosures required by applicable law and listing requirements of any stock exchange on which the Company's securities are listed[, and] oversee the design, implementation, organization and performance of the Company's internal audit function."

57.     In a section titled "***FINANCIAL REVIEW AND DISCLOSURE***," the Audit Committee Charter states that the Audit Committee is responsible for the following:

6.     **Audited Financial Statement Review; Quarterly and Annual Reports.** The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and

Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

7.      **Earnings Announcements.** The Committee will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information).

8.      **Proxy Report.** The Committee will oversee the preparation of any report of the Committee required by applicable law or Exchange listing requirements to be included in the Company's annual proxy statement.

58.     In a section titled "***INTERNAL CONTROL AND PROCEDURES***,"

the Audit Committee Charter states that the Audit Committee will be responsible

for:

**Risk Assessment and Management.** The Committee will review and discuss with the Board, management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to privacy, technology, information security (including cyber security and back-up of information systems), competition and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's privacy and information security policies and practices and the internal controls regarding privacy and information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. The Committee will review and discuss with the Board and

management the adequacy of the Company's insurance programs, including director and officer insurance, product liability insurance and general liability insurance.

59.     The Audit Committee Charter further states that the Audit Committee is responsible for:

> **Internal Control over Financial Reporting; Disclosure Controls.** The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting, including the Company's information and cyber security systems, and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any significant deficiencies and/or material weaknesses.

## SUBSTANTIVE ALLEGATIONS

### *Background*

60.     Allbirds was founded in 2015 by Co-CEO Defendants Joseph Zwillinger and Timothy Brown as a footwear company that prioritized sustainability. While the Company currently offers products other than footwear, the Company has maintained, as recently as its annual report on Form 10-K filed with the SEC on March 10, 2023, that "footwear represents the vast majority of our revenue and is the foundation of our brand."

61.     Allbirds core products include its Wool Runner and Dasher shoes, branded as comfortable lifestyle and performance shoes. In March 2016, Time Magazine referred to the Wool Runner as "the world's most comfortable shoes," and

in May 2020, Runner's World stated that "the Dasher oozes casual comfort, but is a legit running shoe. Seriously." Allbirds' core customer is between 30 and 40 years old; 55% of its customers are female and over 60% earn $100,000 or more in annual income.

62.     Allbirds' brand was critical to its early growth and success and centered around three fundamental premises: climate change is an existential threat to humanity; environmental impact is relevant to consumer purchase decisions; and consumers do not want to choose between looking good, feeling good, and doing good. Indeed, Allbirds became a billion dollar unicorn in 2018 in part by capitalizing off of a growing awareness of the adverse environmental impacts of fast fashion. The Individual Defendants have acknowledged this, stating in each quarterly and annual report filed during the Relevant Period that "[t]he Allbirds brand is integral to our business strategy and our ability to attract and engage customers. As a result, our success depends on our ability to maintain and enhance the value and reputation of the Allbirds brand."

63.     According to FE 4 and FE 7, each of whom had direct contact with Defendants Zwillinger and Brown, described their managerial style as highly involved and controlling, with FE 7 stating that "no decisions were made without them," and FE 4 referring to Allbirds as "the Tim and Joe show." However, Defendants Zwillinger and Brown both lacked retail experience. While Defendant

Zwillinger earned an MBA at the Wharton School, his work experience since then consisted of only six years at the biotechnology company Terravia. Defendant Brown is a former professional soccer player. Under their leadership, the Company has incurred substantial losses.

64.   Allbirds' IPO took place November 3, 2021. In the months leading up to the IPO, the Individual Defendants began to shift the Company's business strategy in three key ways that contradicted their public statements and led the Company to suffer significant losses: (i) divestment from the core products that made the Company successful prior to its IPO to dedicate more resources on new product offerings that did not resonate with core consumers; (ii) aggressive expansion of Allbirds' brick-and-mortar stores despite the fact that its existing physical stores were struggling due to inventory issues, market saturation and cannibalization; and (iii) substantial cuts to the Company's marketing budget every year since 2019 despite the importance of, and the Individual Defendants' purported commitment to, brand awareness.

***Divestment from Core Products and Shift Towards Ill-Conceived New Offerings***

65.   According to FEs 1 and 6, the Company's core offerings constituted roughly 80% of Allbirds' business; despite this, FE 1 recalled the Company shifting its focus toward various new apparel offerings, beginning with t-shirts in October 2020.

66.     FE 5 remembered this shift beginning in 2019 in the months leading up to the IPO and explained that the launch of apparel in October 2020 signified a significant departure from the Company's core mission of producing unique and sustainable shoes. FE 5 noted that Allbirds apparel was not designed by an apparel designer but by an industrial designer named Jamie McLellan, a friend of Defendant Brown. FEs 3 and 4 confirmed that the Company lacked the experience and knowledge to make apparel.

67.     According to FE 8, "everyone knew apparel was going to fail" and that the Company attempted to expand too quickly. FE 1 and FE 2 corroborated that the apparel launch was unsuccessful from the start. FEs 1, 3, and 4 stated that Allbirds introduced too many apparel products without proper product testing or any concrete, long-term strategy in place. Indeed, immediately after launching t-shirts in October 2020, Allbirds launched its run collection, which included tank tops, sports bras, leggings, and biker shorts. Immediately after launching the run collection, the Company introduced its rest and relaxation collection, offering hats beanies, and scarves for the holidays. FEs 1 and 3 explained that Allbirds went from one t-shirt to thirty different apparel products in mere months.

68.     FEs 2, 3, and 6 further recall that the Company overproduced apparel products, leading to excess inventory accumulation and forcing Allbirds to open outlet stores and sell its products to off-price retailers including T.J. Maxx.

69.     According to several former employees, the Company's apparel offerings were designed and manufactured poorly. For example, FE 6 stated that the Company's t-shirts were expensive but lacked durability according to countless customer complaints. FE 9 similarly recalled the t-shirts deteriorating quickly and stated further that they had a "clunky design," and they were not well-received by consumers. FE 2, who directly oversaw several physical stores, stated that Defendants Zwillinger and Brown conducted monthly on-site visits at the stores, beginning in October 2020 shortly after the t-shirt launch. FE 2 recalled reporting the poor performance of apparel in the stores to Defendants Zwillinger and Brown during the monthly visits.

70.     Further, the Company held monthly sales and operations meetings that were attended by Defendants Zwillinger, Brown, Bufano, and other senior executives. FE 1 stated that at each of the monthly meetings that FE 1 attended following the apparel launch, the poor performance of the Company's apparel products were discussed. FEs 3 and 4 confirmed that everyone knew at the monthly meetings that apparel "was not a hit." FEs 6 and 8 explained that while the apparel's poor performance was widely known throughout the Company, apparel production continued to accelerate.

71.     FEs 3 and 7 recalled a specific apparel meeting at which Chief Product Officer Susi Proudman ("Proudman") presented the fabric Allbirds intended to use

for its leggings. Both FE 3 and FE 7 recalled voicing concerns over the transparency of the fabric, but they explained that the senior officers were not receptive to input. According to FE 4, when the Company ultimately went ahead with the leggings launch in the Spring of 2021, the first collection had to be thrown away because they were transparent. FE 4 and FE 8 similarly stated that Allbirds created a lot of waste for a Company that purported to stand for sustainability.

72.     In addition to Allbirds' monthly meetings, the Company held two large management meetings every year attended by senior executives, store manager, buyers, and product designers. Flock Week was held in January and Back to the Birdhouse was held in September. According to FE 6, at each of these meetings, participants discussed the poor performance of the Company's apparel offerings. FE 6 further stated that store managers provided negative feedback regarding Allbirds' apparel at the meetings, and they expressed skepticism about the unrealistic targets set by senior executives.

73.     Senior executives aggressively pushed Allbirds' apparel offerings despite the Company's clear reliance on its core offerings, demonstrated by the following non-public graphic which was presented during Flock Week, illustrating Allbirds' 2020 sales:



74.     During those meetings, Proudman discussed the target customer for Allbirds' apparel, referred to as "Charlie," a Generation Z customer, between 20 and 30 years old, fashion forward, and eco-conscious:



75.     The Company was thus disregarding its core customer, traditionally between 30 and 40 years old and earnings at least $100,000.

76.     FE 1 and FE 4 stated that, as a result of the unsuccessful apparel launch, Allbirds terminated Proudman in early 2021. FE 4 and FE 7 stated that Defendants Zwillinger, Brown, and Bufano took no accountability for the failures of the Company despite wielding all of the decision-making power. According to FE 2, the Company laid off the entire apparel team in May 2023.

77.     Further, the Company overinvested in new footwear offerings at the expense of its core products. FE 2 recalled the launches of Allbirds' Flyer and Pacer shoes, which were both unsuccessful due to poor marketing and execution. For instance, while Allbirds marketed its Flyer shoes to runners, the shoes failed to withstand the wear and tear of running.

78.     FE 9 recalled retail store employees questioning the Company's decision to shift toward apparel and running shoes because "this is not our customer." FE 9 explained that Allbirds' stores suffered significant inventory issues, with insufficient product to meet demand for core products and excess inventory of Flyer and Pacer shoes and Allbirds apparel that stores could not move. FE 9 recalled retail employees "screaming, we need to be on our core product, our core customer," but Allbirds' leadership "didn't listen to anybody."

*The Company's Aggressive Expansion of Physical Stores*

79.    According to FE 3 and FE 4, the Company opened stores at an aggressive "dizzying pace," often in close proximity to existing stores, despite the fact that those existing stores were struggling to attain profitability. This aggressive expansion led to oversaturation and even cannibalization, whereby Allbirds' stores had to compete with themselves. For instance, FE 3 recalled Allbirds expanding in Los Angeles from one store to five in just one year and further recalled the Company opening four stores in Boston with two opening within three blocks of each other.

80.    FE 3 stated that the number of physical locations increased from 11 retail stores in May 2021 to 46 retail stores in December 2022, with plans for continued expansion in 2023, despite the Individual Defendants' awareness that many of its initial 11 stores were struggling to attain profitability.

81.    Indeed, FE 7 recalled a company-wide meeting during the first quarter of 2021 at which Defendants Zwillinger and Brown told employees that all 11 retail stores were profitable; however, Defendants Zwillinger, Brown, and FE 7 also attended a smaller monthly retail meeting around the same time and discussed the need to close the 11 stores because they were hemorrhaging money.

82.    FE 3 and FE 4 both stated that the poor performance of the Company's physical stores was consistently discussed at monthly real estate meetings attended by roughly twenty people, including Defendants Zwillinger, Brown, and Bufano. FE

3 and FE 4 both recall the Company being forced to open outlet stores in an attempt to offload its underperforming new products.

83.     FE 3 further stated that at the monthly real estate meetings, participants would discuss potential new store openings. FE 3 recalled instances in which Defendants Zwillinger and Brown would consider a location and conclude that the economics did not work, but they would nonetheless sign off on the store opening. FE 7 explained that the Company would simply open new locations to take advantage of lower lease prices post-Covid, without any regard for the economics or to the locations of existing stores, to increase visibility by creating illusory growth.

84.     FE 3 and FE 4 stated that Defendants Zwillinger and Brown personally approved each store opening during the monthly meetings. FE 4 further stated that when he warned Defendants Zwillinger and Brown about oversaturation, they explained that they wanted to show shareholders they were growing post-IPO by increasing their retail presence. FE 7 confirmed that Defendants Zwillinger and Brown spent recklessly to increase gross volume and sales without any regard for long-term profitability.

85.     FE 4 stated that, as operations had become "such a mess" by mid-2021, the co-CEOs were forced to bring in a new Chief Operating Officer, Joseph Vernachio.

86.     At the Back to Birdhouse meeting held September 13-15 2021,

participants expressed frustration to Defendants Zwillinger and Brown regarding inventory management and the rapid expansion of physical stores. Further, FE 9 recalled Defendants Zwillinger and Brown admitting in response to concerns raised regarding inventory management that the Company's inadequate core product inventory resulted from the Company's focus on new product expansion. Nonetheless, the Company set forth a plan to open eighteen more retail stores in 2022.

87.    FE 3 stated that Defendants Zwillinger, Brown and Bufano ultimately acknowledged that the aggressive retail store expansion was unsuccessful during a company-wide meeting in the Summer of 2022. Despite this, FE 3 stated that the Company continued to open new stores and invest in new products even after this meeting.

### The Company Underinvests in Brand Awareness

88.    Allbirds affirmed in its Registration Statement, and in each quarterly and annual report filed with the SEC thereafter, that: "The Allbirds brand is integral to our business strategy and our ability to engage customers. As a result, our success depends on our ability to maintain and enhance the value and reputation of the Allbirds brand."

89.    However, according to FE 5, the Company shifted its marketing strategy from brand marketing, focused on promoting brand awareness and the

consumer's perception of the Company as a whole, to performance marketing, focused more on short-term sales. Instead of hiring a Chief Marketing Officer, Defendant Zwillinger oversaw the Company's brand marketing strategy while Defendant Brown oversaw Allbirds' performance marketing strategy.

90.   According to FE 5, the brand marketing budget shrank from $10 million in 2018 to $6 million in 2019, $4 million in 2020, and $2 million in 2021 while the performance marketing budget exploded to between $30 and $40 million per year. FE 7 confirmed that this shift had already begun before FE 7 started working for Allbirds and corroborated the marketing budget cuts that FE 5 described. FE 7 explained that Defendants Zwillinger and Brown short sightedly cut brand marketing to focus on increasing short term valuation with performance marketing.

91.   To illustrate this shift, FE 5 explained that Allbirds successfully utilized brand marketing when it launched the Tree shoe in 2018. The Company strategically introduced the product in the Spring, because the Tree shoe was "light and breezy," as compared to the Wool shoe which was "soft and cozy." The Company also entered into strategic partnerships with Complex and Paper Magazine. FE 5 explained that during Allbirds' holiday campaign, the Company partnered with a fashion designer to make custom clothing. The clothing was then photographed in Paper magazine and installed in The Oculus Center in New York City, generating substantial publicity for the brand. In contrast, FE 5 explained that performance marketing

tactics include media ads, email campaigns, and other strategies that are intended to generate short-term sales rather than brand awareness. FE 5 stated that performance marketing has its benefits, but it should only be one aspect of a company's marketing strategy.

92.     FE 5 attended monthly marketing meetings with approximately thirty other participants, including Defendants Zwillinger, Brown, and Bufano. According to FE 5, Global Vice President of Marketing Julie Channing, among others, vehemently opposed the lopsided marketing budget, but Defendants Zwillinger and Brown ignored the objections.

**False and Misleading Statements in the Registration Statement**

93.     On August 31, 2021, Allbirds filed its Registration Statement with the SEC which, after several amendments, was declared effective on November 2, 2021. On November 4, 2021, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement.

94.     With respect to the Company's strategy for expanding its offerings, the Registration Statement discussed "incremental launches" of new products that would "capitalize on existing designs":

> Our emphasis on design that removes unnecessary details to highlight our "Hero" materials ***allows us to capitalize on existing designs***. Between our major materials innovations, we deliver product newness and brand excitement from ***incremental launches*** across color, pattern, exclusive partnerships, and additional features. Within our footwear line, we can leverage existing shoe sole tooling by modifying upper

designs to create entirely new styles, transforming iconic styles into franchises. We did this with our first performance running product, the Tree Dasher, by extending that revolutionary midsole and outsole unit to the Wool Dasher Mizzle (weather-resistant), Tree Dasher Relay (laceless design), and our Allbirds x Staple collaboration (inside-out design). We believe this approach to reinventing classic silhouettes creates timeless product style that reduces potential fashion risk that other companies fall prey to.

(Emphasis added).[3]

95.     The Registration Statement touted the Company's "deep connection"

with its customer base:

By making great products and telling the story of an inspirational, purpose-driven brand, we have formed a deep connection with our community of customers. We have sold our products to over four million customers since our founding.

96.     The Registration Statement expanded:

As a brand with a digitally-led vertical retail distribution strategy, we are able to own the customer experience, which allows us to use data to determine *who our customers are, what is important to them, and what products are most relevant and when, allowing us to create a strong connection with our customers.* We have learned that our customers live an active and curious lifestyle, care about health and well-being, prioritize quality over price, frequently purchase products online, live in urban center settings, and appreciate socially conscious brands. In addition to communicating more effectively with our customers, these insights allow us to meet customers' needs through the creation of new products and enhancements to our existing line.

Further, to illustrate the *importance of engaging our customer base,* the average spend by a repeat customer in a given cohort is over 25% more in their second year as compared to what was spent in the first year, and the average spend by a repeat customer continues to increase

---

[3] Unless indicated otherwise, all emphasis in this Complaint is added.

each subsequent year.

97.    The Registration Statement further stated that: "Approximately 53% of our net sales in 2020 came from repeat customers."

98.    The Registration Statement continued: "By deepening our relationships with our repeat customers, we believe we are well-positioned to capture a greater share of the approximately seven pairs of shoes and 68 pieces of clothing that the average American bought in 2018 and realize substantial growth in our business."

99.    While acknowledging "the importance of engaging [Allbirds'] customer base," the Registration Statement failed to disclose that the Company had begun shifting focus aware from its core customer and underinvesting in its core customers' favorite products.

100.    The Registration Statement touted Allbirds' "thriving retail store fleet," despite the fact many of the stores were not profitable:

> Our digital commerce experience is complemented by a ***thriving retail store fleet.*** With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns. All U.S. stores that were operating in 2019 generated approximately $4.3 million in average unit volume, or AUV, in their first 12 months of operation, including the stores that had their first 12 months of sales affected by COVID-19 after March 2020. ***Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.*** While our store channel already generates strong results on a standalone basis, the real power of our vertical retail strategy is the synergy between the physical and digital sides of our business. ***This synergy takes the form***

*of increased brand awareness* and website traffic in the regions where we open new stores, driving an overall lift in sales.

101.   The Registration Statement continued:

Increase store fleet. We have just scratched the surface of our store potential, particularly in the United States, with 27 stores globally as of June 30, 2021. We are in the early phase of a ramp towards *hundreds of potential locations in the future, with strong unit economics.* Furthermore, as our store fleet expands, we expect our growth to accelerate, as compared to 2020, through more efficient customer acquisition, while also receiving the benefit of increasing digital traffic as more people learn about our brand through our stores. Based on our stores' pre- COVID-19 performance, *we believe our new stores will also be highly profitable,* have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.

102.   While claiming that the "potential locations" would have "strong unit economics," the Company was opening new stores in close proximity to existing locations, causing market saturation and cannibalization.

103.   The Registration Statement further touted Allbirds' supply chain infrastructure despite the Company's inventory management issues: "Our supply chain infrastructure is advanced compared to other brands of similar age and size. The unique relationships we have with our vendors give us agility to respond to consumer demands, where inventory can go from purchase order to ex- factory in as little as 45 days."

104.   With respect to the Company's brand marketing strategies, the Registration Statement stated:

- o *Thought leadership moments.* We will continue to be leaders in the fight against climate change, from open-sourcing our Carbon Footprint methodology to vocally challenging copycat brands to copy our sustainability practices and not just our designs. This has helped to amplify our voice and introduce us to new customers who connect with the values of our brand.

- o *Community.* In 2020, we formalized our community marketing efforts by launching the Allgood Collective, a global community of ambassadors who promote the power of collective action as a force for good, embracing the Allbirds brand and products as a vehicle for positive change. The Allgood Collective is how we personify and extend our mission and values into tangible experiences, encouraging meaningful conversations and strengthening our relationship with our existing fans while also allowing us to reach and engage new groups of people.

- o *Expanding our brand beacon through physical touchpoints.* Our stores are situated in high-traffic, popular locations and serve as billboards while providing an immersive and tactile introduction to the brand. Historically, we have seen significant awareness boosts in store markets and efficient new customer acquisition, and we expect this trend to continue with the rollout of additional locations throughout the world.

- o *Full-funnel marketing.* We are at a scale now where it is effective to broaden our marketing funnel from emphasizing direct, digital conversion marketing to a full- funnel approach that utilizes TV and other mediums. We anticipate this will result in expanding our consumer reach to a wider population, showcasing a broader array of products, and taking consumers through the entire brand journey, from awareness through consideration to conversion. As we increase awareness, add stores, and broaden our product assortment, we believe this full-funnel approach will increase marketing efficiency.

105.   This statement was materially false and misleading because it failed to disclose that Allbirds had materially cut its brand marketing budget beginning in 2019 and continued to do so each year.

***Materially False and Misleading Statements Issued During the Relevant Period***

106.   Throughout the Relevant Period, the Individual Defendants issued

materially false and misleading statements in press releases, Form 10-Q reports, Form 10-K reports and on quarterly earnings reports which failed to disclose that: (i) Allbirds was overinvesting in new products, including apparel, at the expense of its core offerings; (ii) the Company's new products did not resonate well with customers; (iii) Allbirds was alienating its core customer with its new offerings; (iv) the Company was pursuing an aggressive expansion of physical stores, causing market saturation and cannibalization; (v) the Company's retail stores were experiencing severe inventory management issues, lacking sufficient inventory for the Company's core products and accumulating excess inventory of the Company's new offerings; (vi) Allbirds had substantially cut its budget for brand marketing despite the acknowledged importance of the Company's brand to its growth and success and (vii) as a result of the foregoing, the Individual Defendants' positive statements about Allbirds' business, operations, and prospects were materially false and misleading and/or lacks a reasonable basis.

107.   On November 30, 2021 Allbirds issued a press release announcing the Company's third quarter 2021 financial results. Therein, Defendant Zwillinger stated:

> [W]e saw strong consumer response in the quarter to our new product innovation including our new Perform Apparel line."
>
> * * *
>
> [W]e're aligning our purpose of reversing climate change with our product quality and financial outcomes.

108.   That same day, during an earnings call (the "3Q2021 Earnings Call"),

Defendant Zwillinger touted the economics of the Company's retail stores:

We opened our first store in 2017. And despite the slowdown of this channel during the pandemic, we now operate a fleet of 35 stores globally with 23 in the U.S. ***each store has strong standalone four wall economics***

\* \* \*

***Our stores generate strong returns on invested capital and have attractive payback periods. And when we open new stores, it drive increased brand awareness, provides a halo effect on the overall business. And hence we approve the efficacy of our marketing spent*** these impacts along with lower return rates and more efficient transportation means that growth in physical retail also drives margin expansion.

We have a strong pipeline of new stores ahead, and ultimately we see white space for hundreds of stores over time.

109.   With respect to the Company's apparel offerings, Defendant Zwillinger

stated:

While we always envisioned building a global lifestyle brand, we opted to make shoes first. And now that we have gained consumers trust, we believe they will now embrace our material innovations apply to apparel categories.

\* \* \*

Underpinning the opportunity to drive growth in our retail and international businesses is an incredible product pipeline, led by footwear with a growing and
 important apparel offering. Our robust R&D engine means that we're continually innovating, in our short history, we've proven that our material and innovation platform creates a powerful flywheel, enabling us to build winning franchises
 while empowering us to expand into new categories.

110.   Defendant Brown similarly touted the Company's apparel offerings,

stating: "[W]e saw a great response in the quarter to our product innovation with

strong traction from the Wool Piper Mid, Sugar Rover and Perform Apparel launch in August, an exciting new collection to complement our performance footwear offering."

111.   On December 7, 2021, Allbirds filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2021, signed by Defendants Zwillinger and Bufano (the "3Q2021 10-Q"). With respect to Allbirds' existing customer base, the 3Q2021 10-Q stated:

> In addition to seeking to acquire new customers, ***we continuously seek ways to engage with our large and growing base of over four million existing customers.*** We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions.
>
>         \* \* \*
>
> [I]t is critical that we maintain our long-trusted commitment to offering the most comfortable, high performance, and sustainable products. Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with new products appealing to our existing customers.

112.   While acknowledging the importance of accommodating the Company's existing customers, the Individual Defendants falsely stated that they continuously engage with core customers. In reality, the Company had been channeling disproportionate Company resources toward offerings that targeted a demographic outside of its core customer base.

113.   The 3Q2021 10-Q further stated:

> In addition, ***our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers,*** particularly those existing customers who are highly

engaged and make frequent and/or large purchases of the products we offer. ***If existing customers no longer find our products appealing***, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.

***If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.***

114.   In disclosing the risk associated with Allbirds' existing customers "decreas[ing] their spending" on the Company's products, the Individual Defendants concealed the fact that these risks had already materialized.

115.   The Individual Defendants further disclosed the risk of Allbirds' "fail[ing] to identify and remedy" quality issues while concealing that they had become aware as early as the apparel launch in October 2020 of quality issues as a result of employee and customer feedback that was discussed at monthly meetings attended by Defendants Zwillinger, Brown, Bufano, and other senior executives:

> If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. ***If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected. If product quality issues are widespread or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected.***

116.   With respect to the Company's brand awareness, the 3Q2021 10-Q stated:

> Marketing expense consists of advertising costs incurred to acquire new customers, ***retain existing customers, and build our brand awareness***. We expect marketing expense to continue to increase in absolute dollars as ***we continue to expand our brand awareness***, introduce new product innovations across multiple product categories, and implement new marketing strategies.

117.   The 3Q2021 10-Q further detailed the Company's marketing strategy without disclosing that most of the marketing budget was allocated to performance marketing at the expense of building long-term brand awareness:

> We create differentiated brand marketing content and utilize performance marketing to drive customers from awareness to consideration to conversion, and promoting awareness of our brand and products is important to our ability to grow our business, drive customer engagement, and attract new customers. Our marketing strategy includes brand marketing campaigns across platforms, including email, digital, display, site, direct-mail, streaming audio, television, social media, and our Allgood Collective, as well as performance marketing efforts, including retargeting, paid search and product listing advertisements, paid social media advertisements, search engine optimization, personalized emails, and mobile push notifications through our app.

118.   The 3Q2021 10-Q touted the Company's "highly profitable" retail stores:

> With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns...We expect our stores to rebound to pre-COVID levels over time following the broader reopening of the economy. ***Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve***

> ***as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.***

119.   The 3Q2021 10-Q further contained the following generic risk disclosure regarding inventory levels:

> Inventory levels in excess of customer demand may result in inventory write-offs, donations by us of our unsold products, inventory write-downs, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices at our outlet store in Northern California.

> Conversely, if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.

120.   The foregoing risk disclosure was materially misleading because Allbirds' had already experienced "inventory levels in excess of customer demand" for its new offerings and "inventory shortages" for its core products.

121.   On February 23, 2022, Allbirds issued a press release announcing its financial results for the quarter and fiscal year ended December 31, 2021. Therein, Defendant Zwillinger stated: "Importantly, we believe that our innovation engine, continued retail store expansion, and increasing international presence will continue

to drive an accelerating topline growth rate in 2022.”

122.   The same day, during an earnings call, Defendant Zwillinger claimed that customers were responding positively to the Company's apparel: *“**Consumers had a positive reaction to product offerings,** particularly our Fluff footwear collection, our slippers that we call the Dwellers, the rerelease of Smallbirds for kids, **and on the apparel side to our comfy and cozy loungewear.**to our comfy and cozy loungewear.”*

123.   Likewise, Defendant Brown claimed the apparel launch was “well received”:

> In apparel, we launched a switch product that has been ***well received by our customers*** and embodies our key differentiator, leveraging unique natural materials to deliver next to skin comfort, a hallmark of the Allbirds brand, which we expect will help us win long-term.
>
> * * *
>
> And then lastly, apparel is a journey. We continue to see that as something that can augment footwear franchises increase average order value, repeat purchase rate***, the strategy is working***.

124.   On March 16, 2022, Allbirds filed its annual Form 10-K with the SEC for the fiscal year ended December 31, 2021, signed by Defendants Zwillinger, Bufano, Blumenthal, Boyce, Brown, Fields, Green, Levitan, and Weiss (the “2021 10-K”). The 2021 10-K again touted the Company's ability to “capitalize on existing designs” and described its new product launches as “incremental”: “Our emphasis on design that removes unnecessary details to highlight our ‘Hero’ materials allows

us to ***capitalize on existing designs***. Between our major materials innovations, we deliver product newness and brand excitement from ***incremental launches*** across color, pattern, exclusive partnerships, and additional features."

125.   The 2021 10-K further touted the Company's "strong connection" with its customers, while failing to reveal that Allbirds had been alienating its core customer base:

> As a brand with a digitally-led vertical retail distribution strategy, we are able to own the customer experience, which allows us to use data to determine ***who our customers are, what is important to them, and what products are most relevant and when, allowing us to create a strong connection with our customers.*** We have learned that our customers live an active and curious lifestyle, care about health and well-being, prioritize quality over price, frequently purchase products online, live in urban center settings, and appreciate socially conscious brands. In addition to communicating more effectively with our customers, these insights allow us to meet customers' needs through the creation of new products and enhancements to our existing line.

126.   The 2021 10-K repeated that claim that the Individual Defendants were "continuously seek[ing] ways to engage" with the Company's existing customers:

> In addition to seeking to acquire new customers, ***we continuously seek ways to engage with our large and growing base of over four million existing customers. We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions***.

* * *

> [I]t is critical that we maintain our long-trusted commitment to offering the most comfortable, ***high performance***, and sustainable products. Our continued growth within our existing customer base will depend in

part on our ability to continue to innovate with ***new products appealing to our existing customers***.

127.   The 2021 10-K contained the same misleading risk disclosures regarding customer retention and quality issues that were contained in the 3Q2021 10-Q:

> In addition ***our future success depends in part on our ability to increase sales to our existing customers over time***, ***as a significant portion of our net revenue is generated from sales to existing customers***, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. ***If existing customers no longer find our products appealing***, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.
>
> ***If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed***.
>
> * * *
>
> If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected. If product quality issues are widespread or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be
>  adversely affected.

128.   With respect to brand awareness, the 2021 10-K stated:

Marketing expense consists of advertising costs incurred to acquire new customers, ***retain existing customers, and build our brand awareness***. We expect marketing expense to continue to increase in absolute dollars as ***we continue to expand our brand awareness***, introduce new product innovations across multiple product categories, and implement new marketing strategies.

129.    The 2021 10-K continued:

***We are focused on increasing brand awareness and consumer touchpoints through the following marketing initiatives:***

- Spreading our message through word-of-mouth, thought leadership and PR, partnerships, and community.

- Extending our reach and connecting with our customers through digital and performance marketing, TV and other media, stores as physical brand beacons, and customer experience.

130.    With respect to the Company's retail stores, the 2021 10-K stated:

With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns...We expect our stores to rebound to pre-COVID levels over time following the broader reopening of the economy. ***Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.***

131.    The 2021 10-K further contained the same misleading risk disclosure

regarding inventory levels that was contained in the 3Q2021 10-Q:

Inventory levels in excess of customer demand may result in inventory write-offs, donations by us of our unsold products, inventory write-downs, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have

in the past donated excess unsold products to third parties and sold certain of our products at discounted prices at our outlet store in Northern California.

Conversely, if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.

132.   The Individual Defendants conceded that they regularly monitored inventory levels and accordingly would have been aware of the inventory management issues across the Company's stores: "We periodically review inventory and make provisions as necessary to appropriately value slow-moving, damaged, and excess inventory."

133.   On May 10, 2022, the Company issued a press release announcing its financial results for the first quarter of 2022 which quoted Defendant Zwillinger as stating:

> [W]e remain focused on driving the topline through ***our core growth pillars of delivering product innovation, growing our store portfolio*** and expanding internationally, with those growth pillars highlighted in 2022 by what we believe is the most exciting new product roadmap in the history of the company.

134.   That same day, during an earnings call (the "1Q2022 Earnings Call"), Defendant Brown touted the release of its running shoe, the Flyer:

Designed to ***perform equally well on a first run on race day or anything in between. The Tree Flyer has gone through extensive development and testing both in our innovation lab and on the road with countless iterations developed to perfect the shoe. The shoe has been road tested by more than 100 runners over 6,000 miles across a wide array of conditions and climates to validate its remarkable performance attributes.*** We are incredibly excited about this launch and as our first high-performance product expected to meaningfully increase our credibility in this category.

The core of what makes the Tree Flyer so special is SweetFoam a first of its kind midsole technology. ***The result is a shoe made for runners of all stripes*** with our highest rebound rate yet at 70%. While midsoles are usually made from petroleum and logan at 100% synthetic, SweetFoam leverages plant-based oils enabling a 20% reduction in carbon footprint versus petroleum-based synthetic alternatives.

Tree Flyer's bouncy airy SweetFoam midsoles are 30% more responsive, 25% lighter and require less energy to manufacture than our existing SweetFoam. A strong testament to Allbirds' ***commitment to sustainable innovation and relentless improvement***, while continuing to tap into the design white space of reductive design to provide style versatility for ***even the best runners***.

135.    The foregoing statement was materially misleading because it failed to disclose that the Company had overinvested in the Flyer at the expense of its core products, and while Allbirds had marketed the Flyer to runners, the shoe could not withstand the wear and tear of running.

136.    Also during the 1Q2022 Earnings Call, Defendant Zwillinger touted the Company's retail footprint:

Now I'll turn to our third growth pillar, the store portfolio and our broader distribution strategy. ***Our retail footprint is highly productive and serves as an efficient means to acquire new customers. Opening new stores drive increased brand awareness and provides a halo effect***

***on the overall business,*** including an increase in the absolute number and mix of repeat customers who shop with us both digitally and in stores.

137.   In response to a question regarding brand awareness, Defendant Bufano touted the Company's "great brand building techniques":

> We're continuing to see that trend really positively. And this is all about using that flywheel of distribution and then, ***great brand great brand building techniques around partnerships and other campaigns that we're running***.
>
> So it's all about methodically building that with stores with ***great marketing***. And as we're doing that we're seeing not only ***good awareness lift***, but also good awareness lift in the right factors.

138.   With respect to the Flyer launch, Defendant Brown stated: "So I think all that consumer research is saying, yes sustainability matters, but it's only in service of better product experiences. And that's our focus. And I think in performance and in ***the flyer I think is a great example of us executing that at a very high level.***"

139.   During the 1Q2022 Earnings Call, Defendant Zwillinger touted the success of Allbirds' stores, when in reality the stores were struggling to attain profitability due to market saturation, cannibalization, and unsuccessful product offerings leading to inventory issues:

> So during COVID we started signing leases in lifestyle centers in suburban malls and whatnot. ***Those have performed really, really well. And those have proven to be much more resilient regardless of the consumer behaviors, or restrictions in the regions and whatnot***.

So we are continuing to – we are continuing to focus on those types of real estate transactions when we're signing leases and **we're seeing quite a bit of positive uplift in those as we start up new stores as well**. But that said, **looking at the Flatiron launch that we just did about a month ago it's been a really, really fantastic launch for us for a new store** and gives us a lot of confidence in the comeback for Manhattan, which is I think a really nice bellwether for a lot of urban environments. **And if you couple that with our store in SoHo we're just seeing a nice trend and that gives us a lot of confidence to hit on those targets we mentioned**.

140.   On May 11, 2022, Allbirds filed its quarterly Form 10-Q for the quarter

ended March 31, 2022 (the "1Q2022 10-Q"). The 1Q2022 10-Q reiterated:

In addition to seeking to acquire new customers, **we continuously seek ways to engage with our large and growing base of over four million existing customers. We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions**.

\* \* \*

[I]t is critical that we maintain our long-trusted commitment to offering the most comfortable, **high performance**, and sustainable products. Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with **new products appealing to our existing customers**.

141.   The 1Q2022 10-Q repeated the misleading risk disclosures regarding

customer retention and quality issues:

In addition, **our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers**, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. **If existing customers no longer find our products appealing**, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our

existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.

> ***If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.***
>
> * * *
>
> If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. ***If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected.*** If product quality issues are widespread or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected.

142.   With respect to the Company's marketing strategies, the 1Q2022 10-Q stated:

> Marketing expense consists of advertising costs incurred to acquire new customers, ***retain existing customers***, and ***build our brand awareness***. We expect marketing expense to continue to increase in absolute dollars as we ***continue to expand our brand awareness***, introduce new product innovations across multiple product categories, and implement new marketing strategies.

143.   With respect to the Company's store fleet, the 1Q2022 10-Q stated:

> With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns...We expect our stores to rebound to pre-COVID levels over time following the broader reopening of the economy. ***Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve***

*as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.*

144.   The 1Q2022 10-Q repeated the misleading risk disclosure regarding inventory levels that was contained in the 3Q2021 10-Q and the 2021 10-K:

> Inventory levels in excess of customer demand may result in inventory write-offs, donations by us of our unsold products, inventory write-downs, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices through our own channels and certain third- party retailers.
>
> Conversely, if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.

145.   On August 8, 2022, the Company issued a press release announcing its financial results for the second quarter of 2022. The press release maintained that Allbirds was prioritizing building brand awareness:

> In this operating environment, we are focused on controlling what we can control and have implemented a series of Simplification Initiatives focused on automating and expanding our supply chain and streamlining our operating structure. These Simplification Initiatives are expected to generate annualized SG&A expense savings of $13 million to $15 million beginning in 2023 and significant cost of revenue savings in future years. *We will reinvest some of these savings into*

***building brand momentum*** through product innovation, marketing, retail stores, and marquee third party partnerships. ***We are confident that these investments in the customer,*** coupled with our Simplification Initiatives, will help us navigate this consumer slowdown and position us for accelerated profitable growth when the headwinds pass.

146.   The same day, during an earnings call (the "2Q2022 Earnings Call"), Defendant Zwillinger touted the Company's Flyer launch: "As per product, Q2 also saw the ***highly successful launch of our first high-performance running shoe, the Flyer.***"

147.   Defendant Brown similarly stated that the consumer response to the Flyer launch was "overwhelmingly positive":

And the response from both consumers and media alike has been ***overwhelmingly positive***. In fact 43% of Flyer sales in the first 30 days post launch were to new customers, which we believe is a ***strong proof point that our performance offering is not only resonating with our existing audience, but bringing new customers into the Allbirds' brand***.

148.   Defendant Brown also touted Allbirds' apparel offerings:

When we decided to connect our successful footwear franchises to apparel offerings, we leverage unique natural materials to deliver next to skin comfort, a consistent hallmark of the Allbirds brand. ***This is reflected in the success of some of our core apparel offerings including our socks, underwear, our classic T- shirts, and sweats, which continue to perform well as expansions of our material platforms and articulations of supernatural comfort***.

149.   Nonetheless, Defendant Brown maintained on the same call that "[t]he innovation and product focus remains vastly on footwear."

150.    Also during the 2Q2022 Earnings Call, Defendant Zwillinger touted the

purported success of the Company's new store openings:

> Our stores are not only the best expression of the Allbirds brand, but
> are a fantastic customer acquisition tool, all while delivering strong
> four-wall economics.
>
> * * *
>
> During the quarter, our US store sales increased nearly 120% year-over-
> year. We opened seven stores in Q2, bringing us to a total of 46 as of
> June 30. To highlight a few. In the US, we opened in Fashion Island in
> Newport Beach in early June, which is ***our first store in Orange County
> and seventh in Southern California*** and it has ***exceeded our
> expectations***.
>
> As we build stores in the region, such as Southern California, ***we see
> meaningful gains in awareness, drive strong store economics across
> the region, while substantially lifting overall commerce across
> channels***.

151.    With respect to building brand awareness, Defendant Zwillinger stated:

> We've done such a good job f early diversification of the media spend
> that we have that we come back to a place where our overall business
> can still have leverage on the marketing line item, ***while we're investing
> and doubling down in brand. And that to us is the right long-term
> formula, so that we can be adaptive and dynamic to the current
> situation, while not sacrificing any of the long-term possibility that
> this brand has.***

152.    On August 9, 2022, the Company filed its quarterly Form 10-Q for the

quarter ended June 30, 2022, signed by Defendants Zwillinger and Bufano (the

"2Q2022 10-Q"). The 2Q2022 reiterated that Allbirds was "continuously seek[ing]

to engage" with its existing customer base:

> In addition to seeking to acquire new customers, ***we continuously seek***

*ways to engage with our large and growing base of over four million existing customers. We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions.*

* * *

[I]t is critical that we maintain our long-trusted commitment to offering the most comfortable, **high performance**, and sustainable products. Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with **new products appealing to our existing customers**.

153.   The 2Q2022 10-Q repeated the misleading risk disclosures regarding customer retention and quality issues:

> In addition, **our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers**, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. **If existing customers no longer find our products appealing**, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.
>
> **If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.**
>
> * * *
>
> If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. **If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected.** If product quality issues are widespread or result in product recalls, our brand and reputation could

55

be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected.

154.   The 2Q2022 10-Q again represented that the Company was prioritizing building brand awareness in its marketing efforts:

> Marketing expense consists of advertising costs incurred to acquire new customers, retain existing customers, and build our brand awareness. We expect marketing expense to continue to increase in absolute dollars as we continue to expand our brand awareness, introduce new product innovations across multiple product categories, and implement new marketing strategies.

155.   The 2Q2022 10-Q no longer referenced a successful retail store fleet nor represented that new stores would be highly profitable as had the Company's previous filings.

156.   The 2Q2022 10-Q repeated the risk disclosure regarding inventory levels that was contained in the Company's previous filings, again concealing the fact that the risks had already materialized:

> Inventory levels in excess of customer demand may result in inventory write- downs, inventory write-offs, donations by us of our unsold products, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices through our own channels and certain third- party retailers. Additionally, for the three months ended June 30, 2022, we recognized a non-cash inventory write-down, primarily for certain first-generation apparel products.

Conversely, if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.

157.   On November 9, 2022, Allbirds filed its quarterly Form 10-Q for the quarter ended September 30, 2022, signed by Defendants Zwillinger and Bufano (the "3Q2022 10-Q"). The 3Q2022 10-Q again falsely represented that the Company was continuously engaging with its existing customer base:

In addition to seeking to acquire new customers, ***we continuously seek ways to engage with our large and growing base of over four million existing customers. We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions***.

* * *

[I]t is critical that we maintain our long-trusted commitment to offering the most comfortable, ***high performance***, and sustainable products. Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with ***new products appealing to our existing customers***.

158.   The 3Q2022 10-Q repeated the misleading risk disclosures regarding customer retention and quality issues that were contained in previous filings:

In addition, ***our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers***, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. ***If existing customers no longer find our products appealing***, are

57

not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.

***If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.***
* * *
If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. ***If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected.*** If product quality issues are widespread or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected.

159.   With respect to the Company's marketing efforts, the 3Q2022 10-Q repeated:

Marketing expense consists of advertising costs incurred to acquire new customers, ***retain existing customers, and build our brand awareness***. We expect marketing expense to continue to increase in absolute dollars as ***we continue to expand our brand awareness,*** introduce new product innovations across multiple product categories, and implement new marketing strategies.

160.   The 3Q2022 included the same misleading risk disclosure regarding inventory issues that was contained in previous filings:

Inventory levels in excess of customer demand may result in inventory write- downs, inventory write-offs, donations by us of our unsold products, and/or the sale of excess inventory at discounted prices, any

of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices through our own channels and certain third- party retailers. Additionally, in the second and third quarters of 2022, we recognized non-cash inventory write-downs, primarily for certain first-generation apparel products.

Conversely, if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.

161.   The statements identified in ¶¶ 106-160 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Allbirds was overinvesting in new products, including apparel, at the expense of its core offerings; (ii) the Company's new products did not resonate well with customers; (iii) Allbirds was alienating its core customer with its new offerings; (iv) the Company was pursuing an aggressive expansion of physical stores, causing market saturation and cannibalization; (v) the Company's retail stores were experiencing severe inventory management issues, lacking sufficient inventory for the Company's core products and accumulating excess inventory of the Company's new offerings; (vi) Allbirds had substantially cut its budget for brand marketing despite the acknowledged

importance of the Company's brand to its growth and success and (vii) as a result of the foregoing, the Individual Defendants' positive statements about Allbirds' business, operations, and prospects were materially false and misleading and/or lacks a reasonable basis.

***The Truth Emerges***

162.   On March 9, 2023, after the market closed, Allbirds issued a press release announcing that Defendant Bufano was stepping down as the Company's CFO effective April 24, 2023.

163.   On that same day, after the market closed, Allbirds issued a press release announcing its financial results for the fourth quarter and full year ending December 31, 2022 (the "4Q2022 Press Release"), which revealed, *inter alia*, a full year 2022 net loss of $101.4 million, a fourth quarter net loss of $24.9 million, a $13% decrease in net revenue relative to the fourth quarter of 2021, a full year 2022 adjusted EBITDA loss of $60.4 million, and a fourth quarter 2022 adjusted EBITDA loss of $12.5 million that included "a $3.5 million loss primarily association with the previously announced discontinuation of certain first-generation apparel."

164.   In the 4Q2022 Press Release, Allbirds conceded that its disappointing results were attributable to underinvestment in brand marketing and the Company's core consumers and to its overly aggressive rate of store openings. Specifically, the Company emphasized that moving forward, it needed to:

- Reignite product and brand

  o Executing a highly-focused brand strategy that reconnects with core consumers

- Optimize U.S. stores and slow pace of openings

  o Driving traffic and conversion to our U.S. fleet and selectively expanding our third party wholesale channel.

165.   Also on March 9, 2023, during an earnings call (the "4Q2022 Earnings Call"), Defendant Zwillinger explained:

However, in this journey we also made some missteps. ***First, we overemphasized products that extended beyond our core DNA***. And as a result, some products and colors have had narrower appeal than expected. ***Because we were spending significant time and resources on these new products that did not resonate well, we underinvested in our core consumers' favorite products***. Finally, we ***did not increase our brand awareness*** to the level that we anticipated.

***In essence, over the past couple of years, we shifted our focus away from our core consumer and we must refocus sharply on this large and attract* [sic] *group.*** Taking a look at Q4 specifically this dynamic was exacerbated by the fact that the final weeks of December were exceptionally promotional and we did not sufficiently promote to meet consumers' expectations. As a result, Q4 was the first quarter of negative growth in our history. We are disappointed with these results. And we know that, as we look ahead the status quo is not enough.

166.   Defendant Zwillinger continued:

***Roughly two years ago***, and after a period of considerable growth, we made a decision to diversify our product ***beyond the core DNA*** of what has made us one of the most beloved brands in footwear in an effort to reach a younger fashion forward and performance-oriented consumer. ***We overinvested in seasonal trend colors and new silhouettes like the Pacer and Flyer***.

Ultimately, we have come to recognize that ***our overinvestment on newness came at the expense of focus on consumers who are loyal to our brands and on nurturing our core franchises*** such as the Runner and Dasher.

167.   Later during the 4Q2022 Earnings Call, Defendant Zwillinger described the Company's strategic and executional missteps with respect to the Pacer and Flyer launches:

So first on the Pacer that was both the product execution and a marketing campaign that was really oriented around a younger consumer really outside the sweet spot of the group of people who have really fell in love with us and love the core franchise for what we do.

And similarly with the Flyer that was a product that was really marketed with heavy orientation around the technical running performance that that item delivers. And it's a great product. We just found out that the customers that were -- that are really in our sweet spot aren't resonating with a core technical performance messaging. And some of that missed execution by us.

168.   Defendant Bufano addressed the Company's underinvestment in brand marketing, stating: "We plan to spend additional US marketing dollars on year-over-year basis in 2023 to support our brand."

169.   With respect to the Company's aggressive pace of store openings, Defendant Zwillinger stated:

***After a year in which we opened 19 new stores in the US*** we are significantly slowing the pace of new store openings in 2023. ***This year we plan to open three stores in the US*** against leases signed in early 2022 and rebalance our focus from opening new stores towards driving profitability and new customer acquisition from our existing fleet, including the roughly half of our US stores that have been opened for less than a year.

170.   With the addition of those 19 stores, Allbirds increased its store count by 80% in 2022, yet its store revenues grew a meager 8% in the fourth quarter of 2022. The Company acknowledged that its aggressive retail store expansion was unsuccessful by committing to opening only three stores in 2023 and focusing on improving the profitability of existing locations.

171.   On this news, the price of Allbirds stock fell a staggering 47% in one day, closing at $1.25 per share on March 10, 2023. At about the time of the commencement of this action, on October 11, 2023, Allbirds' stock price had closed as low as $.94 per share, a decline of more than 93.5% from the Company's $15.00 per share IPO price.

***Insider Sales***

172.   During the Relevant Period, Defendants Levitan, Zwillinger, and Bufano each made unusually timed sales of Company stock while in possession of material non-public information concerning the Company's financial condition and business prospects.

173.   Just two days after the IPO, Defendant Levitan sold 2 million shares of Allbirds stock for proceeds of $30 million. Defendant Levitan further earned proceeds from a sale of 2 million shares sold by Maveron Equity Partners V, L.P. ("Maveron Equity") for $30 million, because Defendant Levitan is one of four managing members of Maveron General Partner V LLC, Maveron Equity's general partner.

174.   Defendant Zwillinger sold 166,665 shares of Allbirds stock for proceeds of $461,786 between January 25, 2023 and February 23, 2023, just weeks before the March 9, 2023 corrective disclosure. Defendant Levitan

175.   Defendant Bufano sold 32,739 shares of Allbirds stock for proceeds of $103,408 in three separate sales during the Relevant Period, the last of which occurred just seven days before the March 9, 2023 corrective disclosure.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

176.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

177.   Allbirds is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

178.   Plaintiff is a current shareholder of Allbirds and was a continuous shareholder of the Company during the period of the Individual Defendants'

wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

179.   At the time this action was commenced, the seven-member Board was comprised of Defendants Blumenthal, Boyce, Brown, Fields, Freeman, Levitan, and Zwillinger. Accordingly, Plaintiff is only required to show that four Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

180.   The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the

Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

181.   The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

182.   As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Allbirds, the Individual Defendants knew, or should have known, the material facts surrounding Allbirds' financial condition and business prospects and the underinvestment in the Company's brand and core product offerings.

183.   Defendants Zwillinger and Brown are not disinterested or independent, and therefore, are incapable of considering a demand because they are named as defendants, and face significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

184.   Defendants Fields, Boyce, and Levitan serve as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's underinvestment in its brand and core product offerings and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Fields, Boyce, and Levitan cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

185.   Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from calling into question the other Individual Defendants' conduct or taking any remedial actions to redress the conduct alleged herein.

186.   The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to

purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Allbirds. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Allbirds, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

187. If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Allbirds to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

188. Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I
### Against the Individual Defendants for
### Breach of Fiduciary Duties

189.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

190.   The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

191.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

192.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

193.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

194.   Plaintiff, on behalf of Allbirds, has no adequate remedy at law.

## COUNT II
### Against the Insider Trading Defendants
### For Breach of Fiduciary Duties (*Brophy* Claim)

195.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

196.   During the Relevant Period, the Insider Trading Defendants held positions with the Company that provided them access to confidential, proprietary information concerning the Company's financial condition and future business prospects.  Notwithstanding their duty to refrain from trading in Allbirds' common stock under the circumstances, the Insider Trading Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

197.   The insider sales detailed herein, were not part of any regular pattern of sales for the Insider Trading Defendants and were suspicious in terms of timing and amount.

198.   The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Allbirds stock. At the time of their stock sales, the Insider Trading Defendants were aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease. The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

199.   Plaintiff, on behalf of Allbirds, has no adequate remedy at law.

### COUNT III
**Against the Individual Defendants for
Unjust Enrichment**

200.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

201.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Allbirds.

202.   The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Allbirds that was tied to their performance or to the artificially inflated valuation of Allbirds.

203.   The Insider Trading Defendants were further unjustly enriched with respect to insider sales of Company stock.

204.   Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

205.   As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

206.   Plaintiff, on behalf of Allbirds, has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants for Violations of § 10(b) of the Exchange Act and Rule 10b-5

207.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

208.   The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

209.   The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above,

which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

210.   The Individual Defendants violated Section 10(b), of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff.

211.   The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Allbirds were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

212.   The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Allbirds, their control over, and/or receipt and/or modification of the materially misleading statements alleged herein, and/or their

associations with the Company which made them privy to confidential proprietary information concerning Allbirds, participated in the fraudulent scheme alleged herein.

213.   As a result of the foregoing, the market price of Allbirds common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of Allbirds common stock in purchasing Allbirds common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

214.   In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

215.  By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the

Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

216.   Plaintiff on behalf of Allbirds has no adequate remedy at law.

## COUNT V
**Against the Individual Defendants for Contribution
Under § 11(f) of the Securities Act and § 21D of the Exchange Act**

217.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

218.   As a result of the misconduct alleged above, the Company is a defendant in the Securities Class Action, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

219.   Federal law provides Allbirds with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

220.   The plaintiffs in the Securities Class Action allege that the Company's Registration Statement, filed with the SEC in connection with its IPO, contained untrue statements of material facts and omitted to state material facts necessary to make the statements not misleading.

221.   Allbirds is the registrant for the IPO, and the Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

222.   As issuer of the shares, Allbirds is strictly liable to the plaintiffs in the Securities Class Action for the misstatements and omissions alleged therein.

223.   The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and not misleading.

224.   The Individual Defendants, because of their positions of control and authority as officers and directors of Allbirds, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Allbirds, including the wrongful acts complained of herein and in the Securities Class Action.

225.   Accordingly, the Individual Defendants are liable pursuant to Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) which creates a private right of action for contribution, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

226.   Allbirds is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

## <u>COUNT VI</u>
### Against the Individual Defendants for Waste of Corporate Assets

227.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

228.   The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Allbirds' internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

229.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Action, and approving performance-based compensation linked to the Company's perceived successes.

230.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

231.   Plaintiff on behalf Allbirds has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 13, 2023                **RIGRODSKY LAW, P.A.**

By: */s/ Seth D. Rigrodsky*
Seth D. Rigrodsky (#3147)
Gina M. Serra (#5387)
Herbert W. Mondros (#3308)
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: gms@rl-legal.com
Email: hwm@rl-legal.com

*Attorneys for Plaintiff*